### WILSON v. FREEDLEY.

(Circuit Court, D. Vermont. November 17, 1903.)

1. CONTRACTS—BREACH—ELEMENTS OF DAMAGE—VERDICT—FORM.
   Where, in an action for breach of contract, plaintiff's damages were alleged under four heads—for defendant's failure to supply water, for defendant's failure to provide a derrick, for failure to transport coal, and for denying an option to do certain additional work—a verdict finding in favor of plaintiff, and finding a specific sum of damages separately under each of such heads, was not erroneous.

2. SAME—EVIDENCE.
   In an action for breach of a quarry contract, evidence held insufficient to support a verdict in favor of plaintiff for not furnishing water and a 16-ton derrick, as provided by the contract.

8. SAME—WORK AND LABOR—QUASI CONTRACT.
   Where a contract for the quarrying of marble required plaintiff to uncover and quarry not less than 50,000 cubic feet during the year 1901, and that, if he uncovered more than such amount, he should have an option of quarrying it on the same terms, and, by reason of his failure to quarry the amount required, he forfeited his right to the option, but he did certain additional uncovering which was beneficial to defendant, the owner of the quarry, plaintiff was entitled to recover for the benefit so conferred.

Motion to Set Aside Verdict.

Orion M. Barber and James L. Martin, for plaintiff.
Fred M. Butler and James K. Batchelder, for defendant.

WHEELER, District Judge. The defendant owns a marble quarry on the side of a mountain, which was supplied with water from a Harwood spring higher up, through a three-quarter inch pipe about two-thirds of the way, and a half-inch pipe the rest of the way, and a derrick at the head of a gravity railroad, by which quarried blocks of marble are taken to his mill at the foot of the mountain below. He contracted in writing with plaintiff for uncovering good marble in a part of the quarry in 1901, and quarrying and delivering on cars not less than 50,000 cubic feet of marble (2,000 cubic feet in April, and 6,000 in each month after), in blocks of "random sizes," at 45 cents a foot, monthly, with a deduction of 10 cents a foot for any deficiency in any month; and he agreed to furnish a derrick for the use of the plaintiff at the head of the railroad, "sufficient to handle blocks of 16 tons weight"; to furnish a supply of running water at the quarry, equal to two-thirds the amount that could be obtained by a three-fourth inch pipe all the way from the Harwood spring, and to transport promptly by the gravity road supplies required by the plaintiff; and that, "if the plaintiff uncovered more good marble than the 50,000 feet required, he should have an option of quarrying it upon the same terms." The plaintiff uncovered in the spring what was estimated to be necessary for quarrying the 50,000 feet required, and quarried and delivered up to December 31, 43,707 feet, from the price of which there was deducted, without objection, 10 cents a foot on 31,231 feet for monthly deficiencies. The defendant required the plaintiff to quit December 31st, and denied his right to quarry further under the option. This suit is brought for damages for not supplying water, for not furnishing a 16-ton derrick, for not transporting supplies promptly, and for not allowing the option.

As to not furnishing water, the plaintiff testified:

"Q. Did that cause you any delay? A. Yes, sir. Q. How—to what extent? A. In the month of March we were shut down eight days, in May we were shut down four days, and in the balance of the season we were shut down a day at a time for not less than 10 days all told—the balance. Q. Making, in all, how many days' loss? A. Making, in all, 22 days. We quarried an average of about 200 feet a day on the average, and it would have made a difference in our output through the year of about 4,400 feet. Q. You say you could have gotten out that amount more if he had complied with the contract in this respect? A. Yes, sir; very easily gotten it out. Q. And the amount of loss to you in that failure to quarry that amount is how much? A. I lost a profit on 4,400 feet at 15 cents a foot, which would be $660. I paid damages 10 cents a foot, which would have been $440; and the repairs that I was compelled to make on the boiler, in the shape of flues, and labor in putting them in, amounted to $225 more. I put in 100 new flues, and 50 flues that had been taken out, and a new piece welded onto the end. The new flues cost $1.25, which would be $125, and the old flues cost 50 cents apiece to have a new piece welded on. Q. Making a total of how much? A. The work of putting them in cost about $75, making a total of $225 on the flues. Q. And how much on the other? A. Making, all total, $1,325."

As to the derrick, the plaintiff testified:

"Derrick not capable of hoisting 16 tons. Small—only 6 guys. Mast not sound. Changed the power. We were compelled to get out blocks much smaller. Could not measure to the limit. We quarried 619 blocks in the year of this contract, and the average 619 blocks was 70 cubic feet to the block. If we had been able to break our blocks, with the idea of being able to handle 16 tons at the wheelhouse, I don't think—in fact, I know—there would have been no trouble in making our average 100 feet to the block, and, instead of having 619 blocks, we should have had about 182 less. Q. Now, on that 182 less, what would have been the gain, or what was the loss per block? A. 437 blocks at 100 feet would have made the same amount which we quarried with 619. * * * 1,092 feet which we lost at 45 cents per cubic foot, $491. On this 1,092 feet, we were obliged to pay damages of 10 cents a cubic foot under the contract for the deficiency, which, at 10 cents a foot would have been $109.20. Then the extra expense of quarrying and handling 182 blocks, which would not have been necessary if we had had sufficient power, I placed at $1 a block, $182. The total foots up $782.20. Q. That includes that 10 cents a foot? A. Yes, sir. Q. That includes the $109.20 of the forfeiture that you had to pay? A. Yes, sir. * * * Q. Were any of those smaller-sized blocks that were referred to quarried that way for convenience to you? A. No, sir; it was an inconvenience to us—the extra trouble of splitting, drilling, and handling these blocks. It was a great inconvenience and great loss. Q. In splitting some of those large blocks so you could handle them, did you occasionally get trouble from not splitting straight? A. Oh, yes. Q. And in that way made smaller-sized blocks? A. Yes, sir; that was my loss."

As to failure to transport supplies, the plaintiff testified:

"We had coal at the mill in December that was not delivered. By reason of our being short of coal, we had to leave off all of our overtime, and were troubled a great many days; obliged to shut off our steam; didn't have coal to furnish steam to do our work. By reason of this shortage, there was 1,000 feet left in there the 1st day of January, which we did not take out, and which, if we had had coal as we should have, would have been a very easy matter to take out. Surface of block was 694 square feet when it was stripped. Q. You say when you got through there at the end of the year there was 1,000 feet left in that block? A. 1,000 cubic feet; yes, sir. Coal was taken up the last two or three days of the year. Q. You say you lost the quarrying of that 1,000 feet. How much damage was that to you, or any way that you may state it, if you have a way of your own of stating the damage, by his failure to comply with this clause? A. Leave out the damage at 10 cents a foot. Q. State that with the other, but state it so we can see just what there is of it? A. The stripping costs 15 cents a cubic foot in that tunnel, and the quarrying costs about the same—about 15 cents a foot. Of course, I didn't have to quarry it. I have charged up the stripping at 15 cents on a thousand feet, would be $150 I paid for the stripping. The profit I would have made if I had quarried it would have been 15 cents more, which would be another $150, and I was charged damages on that 1,000 feet at 10 cents a foot, made another $100, and also the drawing of the coal away cost $7, making $407."

As to denial of the option, the plaintiff testified, calling uncovering "stripping," and uncovered good marble, not quarried, a "block":

"In order to get pay for stripping, I was obliged to quarry out the blocks. Q. Now, what did it cost to strip that block? A. I have figured that the cost of stripping stone in these tunnels is 15 cents a cubic foot, and the size of this tunnel was 1,332. In comparison with the other tunnels which we have driven there, it would have given us 26,640 feet. That is, if this tunnel turned out the same proportion. Q. I was getting at the stripping first. A. The stripping on this amount of stone at 15 cents a foot would be $3,996. Q. You never had any opportunity, or did you have any opportunity— What was said about your quarrying out that block of marble that you stripped

which cost $3,996? A. He refused to allow me to take it out—to continue there. Q. Did you have your machinery there all ready to do it? A. Yes, sir; had a derrick there, hoisting power, railroad graded in. The rails were not laid. Except to transfer them from the other part of the quarry, everything was all ready to put the machines in there and go to quarrying. Q. Now, Mr. Wilson, if you had been permitted to quarry out that block that you stripped as you describe here, how many feet, as near as you can estimate, is there of it, and what would have been the profit? A. The number of feet I estimate at 26,640. I get this from the rate that the stone in other parts of the quarry turned out from the same amount of stripping. The profits on it would have been— I had already put in 15 cents a foot for stripping, but outside of that I would have had 15 cents a foot profit. Q. When you say 'profit,' just what do you mean by that? A. I mean that, after paying the expense of the stripping and quarrying this out, I would have had 15 cents a cubic foot left, after paying all the expenses of the quarrying. Q. The net profit, you say, would have been 15 cents a foot? A. Yes, sir."

And as to the shortages the plaintiff's foreman testified:

"Q. You say you were the foreman there, and had charge of that when Wilson wasn't there. Now, let me ask you, supposing you had had plenty of good water from the Harwood spring, and no trouble about the fuel, and the hoisting power at the derrick had been sufficient, how many more feet of marble, if any, do you think you could have quarried out there before the last of December than you did quarry? A. 10,000 feet."

A quarryman of long experience in that vicinity testified that it is cheaper to get out blocks of large sizes, and, on cross-examination, that those of 8, 10, and 12 tons are of usual sizes. The largest block quarried by the plaintiff was 13 tons. There is no other evidence making the plaintiff's claims any more definite as to right of action or damages.

The defendant claims that the option ended with the year 1901, and that the plaintiff lost all right to it by not quarrying the 50,000 feet within that year according to the contract, and by not quarrying within the year what would be left uncovered after quarrying the 50,000 feet. The court held that, as the plaintiff had not fulfilled his part of the contract by quarrying the full 50,000 feet within the year, he would not be entitled to the option to be exercised at the end of the quarrying the 50,000 feet within the year unless the plaintiff's failure to fulfill was caused by the defendant, in not fulfilling his part of the contract, by not supplying water, not providing a 16-ton derrick, and not taking up coal, and submitted the question whether he was so in fault, and whether that caused the plaintiff's failure to fulfill, to the jury, with instructions, if it was, to find for the plaintiff as to the option, with damages for the consequences. The jury returned a verdict for the plaintiff in the usual form in actions on contract, but finding damages separately, under the direction of the court, for failure to supply water, $885; for failure to provide derrick, $600; for failure to transport coal, $307; for denying option, $8,351.66.

The defendant has moved to set aside the verdict because of its form, as against the evidence, and for excessive damages. The verdict covers all the issues in the case, it differs from a general verdict only in distinguishing the damages, and it conforms to frequent practice. Its special features are of advantage in tracing the findings, and neither injure any one, nor furnish any grounds for setting it aside.

The rulings and instructions seem now to be correct, but an important question arises on the face of the verdict—whether there was any sufficient evidence that the deficiency of 6,293 feet out of the 50,000 was due to the failure of the defendant to perform his parts of the contract. The figures show that the jury followed the plaintiff's statements and estimates as to the extent and consequences of the deprivation of water, which would account for 4,400 feet of the deficiency. But the greatest deficiency occurred in March, while the plaintiff had all the water that came to the quarry from the Harwood spring, instead of two-thirds, and while he was uncovering and not quarrying. If that loss of time, then, was due to the deficiency of water, the statement that the loss of time then in uncovering delayed the whole work for the same length of time during the season, without fault of the plaintiff intervening, is wholly conjectural. Loss of time in uncovering is not shown to have been of the same detriment as in quarrying, and in either case the deficiency caused would be left to be made up at the same profit by an adequate increase of force, and the true damages for the interruption would be what such increase of force would properly cost, of which no evidence is given. The statements of delay and loss in consequence of the deficiency of the derrick are still more conjectural. The derrick furnished was sufficient for what appear to be ordinary random sizes. The handling of greater blocks is shown to be more than proportionally difficult and expensive. The practicability of increasing the average from 70 cubic feet to 100 is a conjecture, and that it would be a gain in either time or profit is a further conjecture founded upon the first. The statements as to delay and loss from failure to transport coal are, in view of the near end of the time in which the plaintiff could do anything more, and of the situation of the 1,000 feet of marble all ready to be quarried, more definite and better founded; but, if adequate and well founded, they would not be sufficient for placing the deficiency of 6,293 feet in the plaintiff's performance to the fault of the defendant. The finding of the jury placing the fault upon the defendant, based, as it is, upon incompetent evidence as to the other 5,293 feet, cannot be sustained. The fault must be substantially that of the defendant, and not materially that of the plaintiff, to entitle the plaintiff to the option without fulfilling on his part. These considerations show that the damages found for not furnishing water and for not providing a 16-ton derrick are too large, and also that there is no place in these findings below which these damages can be said, upon the evidence, to be well founded. The jury apparently went to the full extent of the plaintiff's statements of his claims in these respects, because there was no place to stop at. These damages, therefore, appear to be excessive, and to be without competent evidence to show that they are to any extent well founded. Upon these views, the verdict must be set aside, unless it is corrected by remission down to what is well founded. The uncovering was done with the concurrence of the defendant, and, as it is necessary to the beneficial use of the quarry by the defendant in taking out the good marble, and the plaintiff cannot get any benefit from it otherwise, he seems to be entitled to

recover what he has in that way benefited the plaintiff by increasing the value of the quarry. This, without question, upon the evidence, is about one-half of the damages found for denying the option. The other one-half and the damages for not transporting coal, seem well enough founded to stand. If the plaintiff remits the rest, the motion should accordingly be overruled; if not, the verdict should be set aside.

If plaintiff remits within 20 days the $885 damages for not supplying water, the $600 damages for not providing derrick, and $4,175.83 of the damages for denying the option, the motion to set aside the verdict is to be denied; if not, the motion is to be granted.